No. 14-8003

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT
_____

MOTOROLA MOBILITY LLC,

*Plaintiff-Appellant*,

v.

AU OPTRONICS CORP., et al.,

*Defendants-Appellees*.
_____

On Interlocutory Appeal from an Order of the
United States District Court for the Northern District of Illinois
Case No. 09-cv-6610 (The Honorable Joan B. Gottschall)
_____

SUPPLEMENTAL BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
_____

MARY C. MCLEOD
  *Principal Deputy Legal Adviser*
  U.S. Department of State
  Washington, D.C. 20520

KELLY R. WELSH
  *General Counsel*
  U.S. Department of Commerce
  Washington, D.C. 20230

DAVID C. SHONKA
  *Acting General Counsel*
JOHN F. DALY
  *Deputy General Counsel for Litigation*
MARK S. HEGEDUS
  *Attorney*
  Office of the General Counsel
  Federal Trade Commission
  Washington, D.C. 20580

WILLIAM J. BAER
  *Assistant Attorney General*
BRENT SNYDER
  *Deputy Assistant Attorney General*
KRISTEN C. LIMARZI
JAMES J. FREDRICKS
NICKOLAI G. LEVIN
  *Attorneys*
  U.S. Department of Justice
  Washington, D.C. 20530-0001
  (202) 514-2886

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................1

DISCUSSION.................................................................................................................. 3

    1.  Direct Effect Requirement ....................................................................................... 3

    2.  "Gives Rise To" Requirement ................................................................................11

CERTIFICATE OF COMPLIANCE ...................................................................................17

CERTIFICATE OF SERVICE ......................................................................................... 18

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267 (D.C. Cir. 2005) .............15

*F. Hoffmann-LaRoche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004)..................... *passim*

*Hartford Fire Insurance Co. v. California*, 509 U.S. 764 (1993) .......................................1

*Lotes Co. v. Hon Hai Precision Industries Co.,*
   ___ F.3d. ___, 2014 WL 2487188 (2d Cir. June 4, 2014)................................................. 5

*Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012) (*en banc*).............. 2, 4, 7

*Pfeiffer v. Wm. Wrigley Jr. Co.*, 755 F.2d 554 (7th Cir. 1985)...........................................1

*United Phosphorus, Ltd. v. Angus Chemical Co.,*
   322 F.3d 942 (7th Cir. 2003) (*en banc*) ........................................................................ 7

*United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945) ........................ 3

## FOREIGN CASES AND ADMINISTRATIVE DECISIONS

Case T‑102/96, *Gencor v. Commission* [1999] ECR II‑753 ............................................. 9

Case T-286/09, *Intel Corp. v. Commission* (Gen. Ct. June 12, 2014) ............................. 9

European Commission Decision of Dec. 8, 2010, Case COMP 39.309 *LCD*
   *(Liquid Crystal Displays)*............................................................................................ 10

Japan Fair Trade Commission, Cease-and-Desist Order and Surcharge
   Payment Orders against Manufacturers of Cathode Ray Tubes for
   Televisions, Oct. 7, 2009 ......................................................................... 7, 9

Japan Fair Trade Commission, Cease and Desist Order and Surcharge
   Payment Orders against Marine Hose Manufacturers, Feb. 22, 2008 ...................... 7

## FEDERAL STATUTES

15 U.S.C.:
§ 1 note.......................................................................................................................13
§ 6a....................................................................................................... *passim*

Antitrust Criminal Penalty Enhancement and Reform Act of 2004 § 213,
   Pub. L. No. 108–237, 118 Stat. 661................................................................13

## FOREIGN STATUTES

Korea, Monopoly Regulation and Fair Trade Law art. 2-2 ................................................. **8**

## MISCELLANEOUS

1B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (4th ed. 2013) .................... **6**

Statement of James R. Atwood, *in Foreign Trade Antitrust Improvements
Act, Hearings on H.R. 2326 Before the Subcomm. on Monopolies and
Commercial Law of the H. Comm. on the Judiciary*, 97th Cong. 86
(1981) ...................................................................................................... **5, 6**

Joseph P. Griffin, *Extraterritoriality in U.S. and EU Antitrust
Enforcement*, 67 Antitrust L.J. 159 (1999) .................................. **10**

Scott D. Hammond, Deputy Assistant Attorney General, Antitrust
Division, U.S. Department of Justice, The Evolution of Criminal
Antitrust Enforcement Over the Last Two Decades (Feb. 25, 2010) .........................**13**

H.R. Rep. No. 97-686 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2487......................**5, 11, 15**

Joseph Seon Hur, *Extraterritorial Application of Korean Competition
Law*, 6 Regent J. Int'l L. 171 (2008).......................................................... **8, 9**

ICN Working Group on Cartels, *Building Blocks for Effective Anti-Cartel
Regimes* (2005) ............................................................................ **6**

Kyung-Min Koh & Jung-Won Hyun, *Competition Law in the Republic of
Korea* (2011) .............................................................................. **8**

OECD, *Hard Core Cartels: Third Report on the Implementation of the
1998 Council Recommendation* (2005)................................................**6, 13**

OECD, *Recommendation of the Council Concerning Effective Action
Against Hard Core Cartels* (1998)............................................... **6**

*2012 Report on the WTO Consistency of Trade Policies by Major Trading
Partners* ......................................................................... **7**

U.S. Department of Justice & Federal Trade Commission, *Antitrust
Enforcement Guidelines for International Operations* (1995) ................ **10**

Florian Wagner-von Papp, *Competition Law and Extraterritoriality, in
Research Handbook on International Competition Law* 21 (Ariel
Ezrachi ed. 2012) ................................................................... **8**

## INTRODUCTION

On June 2, 2014, this Court requested that the United States share its views "concerning the potential impact on U.S. foreign commercial relations, and on U.S. foreign relations more generally, of deciding the present appeal one way or another" and regarding "the concerns expressed by [] foreign governments" in amicus curiae briefs. This supplemental amicus brief has been authorized by the Solicitor General and is filed on behalf of the United States in response to the Court's request.

Any extraterritorial application of U.S. law creates the potential for some friction with foreign nations, and the "fear of outright collisions between domestic and foreign law" animates the presumption against the extraterritorial application of federal statutes. *Pfeiffer v. Wm. Wrigley Jr. Co.*, 755 F.2d 554, 557 (7th Cir. 1985). But that presumption has been overcome with respect to the Sherman Act, and it is "well established" that the Act applies to foreign conduct "that was meant to produce and did in fact produce some substantial effect in the United States." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993); *see also id.* at 814.

In enacting the Foreign Trade Antitrust Improvements Act of 1982 (FTAIA), 15 U.S.C. § 6a, Congress reaffirmed the Sherman Act's application to conduct involving foreign commerce—including wholly foreign commerce. By making such conduct subject to the Sherman Act only under certain conditions, Congress also struck a balance that protects our country's commerce and consumers against substantial anticompetitive harm, even when it has foreign origins, while avoiding unreasonable interference with the regulation of foreign markets by other countries. As the Supreme Court has explained, while "[n]o one denies that America's antitrust laws, when applied to foreign conduct, can interfere with a foreign nation's ability independently to regulate

its own commercial affairs," courts have "long held that application of our antitrust laws to foreign anticompetitive conduct is nonetheless reasonable, and hence consistent with principles of prescriptive comity, insofar as they reflect a legislative effort to redress *domestic* antitrust injury that foreign anticompetitive conduct has caused." *F. Hoffmann-LaRoche Ltd. v. Empagran S.A.*, 542 U.S. 155, 165 (2004).

Section 6a guards against unreasonable interference by "lay[ing] down a general rule placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach,"[1] and then "bring[ing] such conduct back within the Sherman Act's reach" only when the two requirements of the section's effects exception are met. *Id.* at 162. First, the conduct must have a "direct, substantial, and reasonably foreseeable effect" on American domestic, import, or (certain) export commerce. 15 U.S.C. § 6a(1). Second, the "effect" must "giv[e] rise to a [Sherman Act] claim." *Id.* § 6a(2). Section 6a thus makes the Sherman Act inapplicable to conduct involving non-import foreign commerce whose effect on the United States is highly attenuated, insignificant, or unpredictable and separately limits the class of claims and plaintiffs that may recover for injuries depending on the connection between those injuries and the requisite U.S. effect.

In this case, the Japanese Ministry of Economy, Trade and Industry (METI), the Ministry of Economic Affairs for the Republic of China, Taiwan (MEA), and the Korea Fair Trade Commission (KFTC) submitted their views, expressing opposition to unreasonably expansive extraterritorial application of U.S. antitrust law. *See* METI Br. 2 (METI "strongly opposes assertion of extraterritorial jurisdiction that would

---

[1] Conduct involving U.S. domestic commerce and U.S. import commerce is "subject to the Sherman Act's general requirements for effects on commerce, not to the special requirements spelled out in the FTAIA." *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 854 (7th Cir. 2012) (*en banc*).

unreasonably interfere with sovereign authority and violate fundamental principles of international law");[2] MEA Letter 1 ("unduly expansive extraterritorial application of U.S. law would undermine principles of international comity"); KFTC Br. 1 ("unduly expansive application of the U.S. antitrust laws, if adopted by this Court, could create conflicts with the sovereignty of other countries including Korea"). But none of these submissions explains how application of U.S. antitrust law to a conspiracy to fix prices for LCD panels, which "doubtless" had an effect on the price of panel-incorporating cellphones sold in the United States, Op. 4, is unreasonably expansive. And none explains why allowing Motorola to recover damages for overcharges it paid on panels incorporated into such cellphones could not reasonably redress that domestic injury.

As explained below, the panel decision is broader than necessary to preserve the balance Congress struck in Section 6a and to avoid harm to U.S. foreign relations.

## DISCUSSION

1.   *Direct Effect Requirement.* The direct effect requirement helps ensure that the Sherman Act is not used to police anticompetitive conduct whose impact, as a practical matter, is limited to foreign markets and, thus, is best addressed by foreign nations. As Judge Learned Hand observed, "[w]e should not impute to Congress an intent to punish all whom its courts can catch, for conduct which has no consequences within the United States." *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 443 (2d Cir. 1945).

The panel's view of what constitutes a direct effect is not necessary to avoid unreasonable interference with the regulation of foreign markets by foreign

---

[2] The METI submission appended briefs filed by the Government of Japan in *Empagran*, which involved claims by foreign plaintiffs in a quite different factual context from this case, *see infra* p. 14.

jurisdictions. The panel decision suggests that defendants' conduct could not possibly have a direct effect on U.S. commerce because, with respect to the Category II panels, those panels were not sold directly "to U.S. customers." Op. 4-5 (emphasis omitted). But if the effects exception were so limited it would reach only conduct that involves import commerce and is, thus, excluded from Section 6a's limitations entirely. *See* US-FTC Am. Br. 8; *cf. Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 857 (7th Cir. 2012) (*en banc*) ("To demand a foreseeable, substantial, and 'immediate' consequence on import or domestic commerce comes close to ignoring the fact that straightforward import commerce has already been excluded from the FTAIA's coverage.").

The Korea Fair Trade Commission contends that allowing Motorola's claims "could create conflicts with the sovereignty of other countries including Korea and could interfere with their antitrust enforcement." KFTC Br. 1. The Commission's premise, however, is that Motorola's claims "aris[e] out of transactions" that "took place outside the United States and had no direct effect on U.S. commerce," a contention that apparently rests solely on the fact that the transactions were wholly foreign. *Id.* at 2. But if the transactions were not wholly foreign—that is, if they involved U.S. import or domestic commerce—then Section 6a's import commerce exclusion would apply, leaving no role for Section 6a's effects exception. *See supra* n.1.

The Korea Fair Trade Commission also contends that applying the Sherman Act here would extend its application "to any intermediary product produced or purchased outside the United States, so long as it is eventually incorporated into an end product sold in the United States." KFTC Br. 3. But there is no reason to believe that would be the consequence of finding a direct effect on U.S. commerce in the particular circumstances here or in many other cases. Anticompetitive conduct involving

4

intermediate products in wholly foreign commerce often has no practical effect on U.S. commerce, in which case the Sherman Act would not apply. Nevertheless, there can be a close, significant, and predictable causal connection between fixing the price of a major component made and sold outside the United States and U.S. commerce in finished products incorporating that component. *See* US-FTC Am. Br. 8-11. As the Second Circuit recently explained, "antitrust law has long recognized that anticompetitive injuries can be transmitted through multi-layered supply chains." *Lotes Co. v. Hon Hai Precision Indus. Co.,* ___ F.3d. ___, 2014 WL 2487188, at *15 (2d Cir. June 4, 2014). "There is nothing inherent in the nature of outsourcing or international supply chains that necessarily prevents the transmission of anticompetitive harms or renders any and all domestic effects impermissibly remote and indirect." *Id.*

While the panel was concerned that adopting Motorola's position would create "friction with many foreign countries," Op. 8, Congress was aware of the potential for friction when considering the FTAIA bill, but concluded that the "bill is not intended to restrict the application of American laws to extraterritorial conduct where the requisite effects exist." H.R. Rep. No. 97-686, at 13 (1982) (citing Statement of James R. Atwood at n.7), *reprinted in* 1982 U.S.C.C.A.N. 2487, 2495.[3]

---

[3] In the cited footnote, James Atwood, a former Deputy Assistant Secretary and Deputy Legal Adviser in the U.S. Department of State, made "clear that [he was] not suggesting that the United States abandon its controversial practice, frequently protested by other nations, of enforcing U.S. antitrust against extraterritorial conduct that has adverse effects within the United States." *Foreign Trade Antitrust Improvements Act, Hearings on H.R. 2326 Before the Subcomm. on Monopolies and Commercial Law of the H. Comm. on the Judiciary*, 97th Cong. 86, 92 (1981). He explained that "[w]hile this enforcement practice has generated most of the international friction associated with U.S. antitrust, it is simply too important from the standpoint of American interests to abandon wholesale." *Id.* "Moreover," he continued presciently, "it should continue to

In any event, the panel's concern over international friction is unwarranted because the panel's view of the direct effect requirement is not necessary to avoid harm to the United States' general or commercial relations with foreign jurisdictions. Here, the price-fixing conduct is condemned by both domestic and foreign laws. Indeed, a global effort against hard core cartels, like the LCD price-fixing cartel, has emerged, partly due to the work of the Organisation for Economic Co-operation and Development (OECD) and the International Competition Network (ICN). The ICN is a consensus-based collaboration of over 130 national competition agencies, including the Japan Fair Trade Commission, the Korea Fair Trade Commission, the Taiwan Fair Trade Commission, the Federal Trade Commission, and the U.S. Department of Justice. The ICN working group devoted to cartels has observed that cartels are "a direct assault on the principles of competition," that they are "universally recognized as the most harmful of all types of anticompetitive conduct," and that "the prohibition against cartels is now an almost universal component of competition laws." ICN Working Group on Cartels, *Building Blocks for Effective Anti-Cartel Regimes* 5 (2005), *available at* www.international competitionnetwork.org/uploads/library/doc346.pdf.[4]

A conspiracy to fix the price of products predominantly exported "transfers wealth away from the territory containing the buyers and toward the territory containing the sellers." 1B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 272j, at 348 (4th

---

gain greater international acceptance as foreign antitrust laws develop and as American courts and prosecutors give increased weight to comity considerations." *Id.*

[4] *See also* OECD, *Recommendation of the Council Concerning Effective Action Against Hard Core Cartels* (1998), *available at* http://www.oecd.org/daf/competition/ 2350130.pdf; OECD, *Hard Core Cartels: Third Report on the Implementation of the 1998 Council Recommendation* 7-8 (2005) ("2005 OECD *Cartel Report*"), *available at* http://www.oecd.org/competition/cartels/35863307.pdf.

ed. 2013). Thus, as this Court noted in *Minn-Chem*, the price fixers' host countries "often have no incentive" to enforce their antitrust laws and "would logically be pleased to reap economic rents from other countries." 683 F.3d at 860. If a country cannot redress injury to its consumers from foreign cartels, that victimization of its consumers could become a source of tension with the countries of conspiring sellers.

It is not surprising then that the extraterritorial application of antitrust laws on the basis of effects on a country's own commerce is now accepted by many jurisdictions around the world.[5] For example, the Japan Fair Trade Commission has taken action recently against cartel members not operating in Japan but whose conduct had an effect in Japan. *See* Japan Fair Trade Comm'n, Cease-and-Desist Order and Surcharge Payment Orders against Manufacturers of Cathode Ray Tubes for Televisions, Oct. 7, 2009, *available at* http://www.jftc.go.jp/en/pressreleases/yearly-2009/oct/individual-000037.files/2009-Oct-7.pdf; Japan Fair Trade Comm'n, Cease and Desist Order and Surcharge Payment Orders against Marine Hose Manufacturers, Feb. 22, 2008, *available at* http://www.jftc.go.jp/en/pressreleases/yearly-2008/feb/individual_000147.files/2008-Feb-22.pdf. The Japanese Ministry of Economy, Trade and Industry, which filed an amicus brief in this case, has recognized elsewhere that "competition laws can be applied extraterritorially only in cases where actions taken outside a country have a direct and substantial impact on competition in the domestic markets." *2012 Report*

---

[5] *Cf. United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 960 n.1 (7th Cir. 2003) (*en banc*) (Wood, J., dissenting) (noting that, as of 2003, "over 90 countries have competition laws" and "the number of disputes over so-called extraterritorial application of national laws, whether by the United States, the European Union, or others, has dropped dramatically").

*on the WTO Consistency of Trade Policies by Major Trading Partners* 639, *available at*
http://www.meti.go.jp/english/report/downloadfiles/2013WTO/02_14_reference.pdf.[6]

Similarly, Korea's antitrust law has been amended to provide that it "shall apply to
any extraterritorial conduct when it affects domestic market." **Monopoly Regulation and
Fair Trade Law art. 2-2**, *as translated at* http://eng.ftc.go.kr/bbs.do?command=getList
&type_cd=62&pageId=0401; *see also* **Kyung-Min Koh & Jung-Won Hyun**, *Competition
Law in the Republic of Korea* 29 (2011). A former Secretary-General of the Korean Fair
Trade Commission noted that this provision "reflects the effects doctrine currently
adopted by many countries." **Joseph Seon Hur**, *Extraterritorial Application of Korean
Competition Law*, 6 Regent J. Int'l L. 171, 174 (2008) (footnote omitted); *see also*
**Florian Wagner-von Papp**, *Competition Law and Extraterritoriality, in Research
Handbook on International Competition Law* 21, 57 (Ariel Ezrachi ed. 2012)
("extraterritorial application of antitrust laws on the basis of the effects doctrine is by
now widely accepted").

The Korea Fair Trade Commission asserts in its amicus brief that "[u]nder
prevailing international norms, claims should be brought in a country in which the
underlying transactions took place and should be governed by the laws of that country."
KFTC Br. 3. Yet even before the Korean law was amended, the Commission found
international norms no obstacle to fining German, Japanese, and American graphite

---

[6] In this report, METI criticized the extraterritorial application of U.S. antitrust law
when the only direct and substantial effect on U.S. commerce is on U.S. exporters and
U.S. consumers are unaffected. 2012 Report at 639-40. This criticism implicates Section
6a(1)(B), which includes in the FTAIA's effects exception conduct affecting the "export
trade or export commerce with foreign nations, of a person engaged in such trade or
commerce in the United States," but which is not at issue in this case.

electrode producers for cartel activity outside Korea that adversely affected Korean commerce. *See* Hur, *supra*, at 184-86.

The practice and views of other jurisdictions also undermine the Korean Commission's assertion. For instance, the European Union finds the application of its antitrust laws to conduct involving sales outside Europe "justified under public international law" when that conduct has an "immediate, substantial, and foreseeable effect" in Europe. Case T-286/09, *Intel Corp. v. Comm'n* ¶¶ 231, 233-36, 243-44, http://curia.europa.eu/juris/document/document.jsf?text=&docid=153543&pageIndex =0&doclang=EN&mode=req&dir=&occ=first&part=1&cid=340077 (Gen. Ct. June 12, 2014) (citing Case T‑102/96 *Gencor v. Comm'n* [1999] ECR II‑753 ¶ 90). Accordingly, a European court recently rejected Intel's argument that its conduct concerning sales of computer central processing units (CPUs) to two computer manufacturers, Acer and Lenovo, was beyond the European Commission's jurisdiction because Intel sold the CPUs in Asia, where they were incorporated into Acer and Lenovo computers, and sales of those computers in Europe were carried out by Acer and Lenovo, which were not controlled by Intel. *Id.* ¶¶ 226-27, 254-82, 292-96. The conduct had the requisite effect to justify application of European Union law. *Id.* ¶¶ 259-82, 292-96. "Contrary to" Intel's arguments, "the fact that Intel did not sell CPUs to Acer in [Europe] does not mean that the effect in [Europe] of Intel's conduct could only have been indirect." *Id.* ¶ 279; *see also* ¶ 293 ("The fact that Intel sells CPUs, whilst Lenovo sells computers, does not mean that the effect can be only indirect.").[7]

---

[7] *See also*, *e.g.*, Japan Fair Trade Comm'n, Cease-and-Desist Order and Surcharge Payment Orders against Manufacturers of Cathode Ray Tubes for Televisions, Oct. 7, 2009 ¶ 2 (fining Japanese, Korean, Malaysian, Indonesian, and Thai companies for

In light of the widespread antitrust law and practice in foreign jurisdictions, as well as the effects exception's "gives rise to" requirement limiting redress to claims arising out of the effect on U.S. domestic and import commerce, a decision holding that defendants' LCD price-fixing conspiracy had a direct effect on that commerce should not adversely impact U.S. foreign relations, including foreign commercial relations. Indeed, the United States has criminally prosecuted several foreign defendants for fixing the price of LCD panels manufactured abroad, based in part on effects of that price fixing on import commerce in products incorporating those LCD panels. As explained in the May 19, 2014 letter from the Solicitor General, we are not aware of any instance in which a foreign government has expressed disapproval of those prosecutions to any official of the United States, despite regular consultations between officials of the U.S. antitrust agencies and their foreign counterparts. The United States carefully considers international comity and exercises prudence before bringing any antitrust enforcement actions that might implicate the interests of a foreign jurisdiction. *See Empagran*, 542 U.S. at 171 (citing Joseph P. Griffin, *Extraterritoriality in U.S. and EU Antitrust Enforcement*, 67 Antitrust L.J. 159, 194 (1999)); U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Enforcement Guidelines for International Operations* § 3.2 (1995) (outlining comity factors the agencies consider before bringing an antitrust action); *see also id.* at § 2.92.

---

fixing the price of cathode ray tubes incorporated into televisions outside Japan), *available at* http://www.jftc.go.jp/en/pressreleases/yearly-2009/oct/individual-000037.files/2009-Oct-7.pdf; European Commission Decision of Dec. 8, 2010, Case COMP 39.309 *LCD (Liquid Crystal Displays)* ¶¶ 380-81 (finding the authority to impose fines based on LCD panels sold outside Europe and incorporated into finished products sold in Europe by third parties but declining to exercise that authority because it was not necessary to achieve sufficient deterrence), *available at* http://ec.europa.eu/competition/antitrust/cases/dec_docs/39309/39309_3643_4.pdf.

2.  *"Gives Rise To" Requirement.* **Even when conduct involving wholly foreign commerce has the requisite effect on U.S. commerce, a plaintiff also must show that the effect on U.S. commerce "gives rise to" the claim at issue. 15 U.S.C. § 6a(2);** *Empagran*, **542 U.S. at 174-75. This requirement serves two functions. It ensures that the effect on U.S. commerce is "an** *adverse* **(as opposed to a beneficial) effect."** *Empagran*, **542 U.S. at 174 (citing H.R. Rep. No. 97-686, at 11,** *reprinted in* **1982 U.S.C.C.A.N. 2487, 2496). It also ensures that the plaintiff's injury is sufficiently related to that domestic effect so that its redress furthers "the FTAIA's basic intent" consistent with considerations of "comity and history."** *Id.*

**The way this requirement limits private plaintiffs' damages claims has garnered significant attention from foreign governments. For example, it was the focus of the Brief of the Government of Japan in** *Empagran*, **which the Japanese Ministry of Economy, Trade and Industry resubmitted to the district court in this case. There, Japan expressed its concern that Japanese companies not be subject to claims by "private foreign plaintiffs who purchased vitamins from Petitioners only in foreign markets and are now seeking treble damages in private lawsuits filed in United States" for such foreign purchases. Brief of the Government of Japan in Support of Petitioners at 1,** *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, **542 U.S. 155 (2004) (No. 03-724);** *see id.* **at 8-9; Brief for Government of Federal Republic of Germany and Belgium As Amici Curiae Supporting Petitioners at 2-3,** *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, **542 U.S. 155 (2004) (No. 03-724) (observing that "[o]ther nations share common ground with the United States in applying the effects doctrine," but also setting forth Germany's and Belgium's interest "in seeing that German [and Belgian] companies are not subject to the extraterritorial reach of the United States' antitrust laws by private**

foreign plaintiffs—whose injuries were sustained in transactions entirely outside United States commerce—seeking treble damages in private lawsuits against German [and Belgian] companies"), *available at* 2004 WL 226388 (Feb. 3, 2004).

The United States took the view in *Empagran* that allowing foreign plaintiffs to seek damages for independently caused foreign harm would "open United States courts to suits that are strikingly localized to foreign countries"—a result "Congress could not have intended." Brief for the United States as Amicus Curiae Supporting Petitioners at 12, *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004) (No. 03-724), *available at* http://www.justice.gov/osg/briefs/2003/3mer/1ami/2003-0724.mer. ami.pdf.

The Supreme Court agreed that "Congress would not have intended the FTAIA's exception to bring independently caused foreign injury within the Sherman Act's reach." *Empagran*, 542 U.S. at 173. No case prior to the FTAIA had applied the Sherman Act to allow foreign plaintiffs to recover for "foreign injury" caused by "foreign anticompetitive conduct" producing both "an adverse domestic effect" and "an independent foreign effect giving rise to the claim." *Id.* at 158-59. And the FTAIA did not expand the Sherman Act's reach. *Id.* at 169-73. Consistent with the pre-FTAIA understanding that the antitrust laws "redress *domestic* antitrust injury that foreign anticompetitive conduct has caused," and with "principles of prescriptive comity," the Court explained, the term "gives rise to a claim" must mean gives rise to "the 'plaintiff's claim' or 'the claim at issue.'" *Id.* at 165, 169, 173-75.

In its *Empagran* brief, the United States also expressed its concern that allowing foreign plaintiffs to recover for independently caused foreign injury would harm its

leniency program and thus not help protect U.S. consumers.[8] While the potential liability for treble damages would greatly expand, overall deterrence would be undermined because price fixers would be discouraged from applying to the leniency program and thus from exposing cartels in the first place. U.S. *Empagran* Br. 5, 21.

Here, the Korea Fair Trade Commission also expresses a concern about its own leniency program, contending that, under Motorola's expansive view of the U.S. antitrust laws, companies would be discouraged from applying to the KFTC leniency program because it would "result in a greater likelihood of facing private antitrust damages actions in the United States." KFTC Br. 4. The Commission's concern appears based on the prospect of a U.S. treble damages remedy—not on the potential for any damages, and it acknowledges its own damages remedy, KFTC Br. 3. But a qualifying leniency applicant in the United States only faces single damages based on the applicant's own affected commerce. Antitrust Criminal Penalty Enhancement and Reform Act of 2004 § 213, Pub. L. No. 108–237, 118 Stat. 661, 666-67 (codified as amended at 15 U.S.C. § 1 note).

If the Commission's concern is premised on U.S. courts adjudicating "treble damages actions arising out of transactions that occur wholly in foreign countries and that have no meaningful connection to the United States," U.S. *Empagran* Br. 21, that is

---

[8] To help enforce their laws against price fixing, the competition authorities of over fifty countries now have programs that offer leniency to the first member of a price-fixing conspiracy that reports the conspiracy and cooperates against its co-conspirators; simultaneous leniency applications to multiple competition authorities are increasingly common. *See* Scott D. Hammond, Deputy Assistant Attorney General, Antitrust Division, U.S. Dep't of Justice, The Evolution of Criminal Antitrust Enforcement Over the Last Two Decades 1-5 (Feb. 25, 2010), *available at* http://www.justice.gov/atr/public/speeches/255515.pdf; 2005 OECD *Cartel Report*, *supra* n.4, at 9-11, 33.

a valid concern—one the United States expressed in *Empagran*, *see id.* at 19-21. By contrast, to the extent the Commission's concern is premised on its program being undermined by the redress in U.S. courts of injury arising from U.S. effects, that premise would not provide a basis to change the balance struck by Congress in Section 6a. Moreover, in the United States' experience, the damages exposure price fixers face from claims with the requisite U.S. connection has not discouraged them from seeking leniency. If Motorola's claims have the requisite connection to U.S. effects, then U.S. law can be applied without undermining foreign leniency programs.

Some of Motorola's claims resemble the failed claims in *Empagran*, but others do not. *Empagran* involved "vitamin sellers around the world that agreed to fix prices, leading to higher vitamin prices in the United States and independently leading to higher vitamin prices in other countries." 542 U.S. at 159. Even though the conspiracy had an "adverse domestic effect" on domestic commerce and import commerce in vitamins, foreign purchasers could not recover for their independently caused foreign harm. *Id.* at 175. Motorola's claims based on purchases of LCD panels that never entered the United States, the so-called Category III claims, closely resemble the foreign purchasers' claims in *Empagran* because, in both cases, the product never entered the United States and any effect on U.S. commerce of the price fixing would likely be independent of those purchases.

Motorola's claims based on purchases of LCD panels that were incorporated into cellphones imported to and sold in United States, the so-called Category II claims, are quite different from the claims in *Empagran*. Contrary to defendants' suggestion, Resp. to Rehearing Pet. 5, *Empagran* does not require that a plaintiff suffer its injury in the United States. As the D.C. Circuit explained on remand in *Empagran*, that proposition

14

"has no support from the text of the statute" and is dispelled by the legislative history, which provides that the effects exception "'does not exclude all persons injured abroad from recovering under the antitrust laws of the United States.'" *Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267, 1269 (D.C. Cir. 2005) (quoting H.R. Rep. No. 97-686, at 10).

Instead, the Supreme Court directed lower courts to distinguish claims arising from independent foreign injury—which are barred by the FTAIA—from claims sufficiently linked to the anticompetitive conduct's effects on U.S. commerce. *Empagran*, 542 U.S. at 175. In the proceedings on remand, Japan and other foreign governments acknowledged that the Supreme Court had "left open" the possibility that foreign plaintiffs could bring claims for foreign injury "in a narrow set of cases" in which those injuries were "'inextricably bound up with . . . domestic restraints of trade' and the plaintiff 'was injured . . . by reason of an alleged restraint of our domestic trade.'" Brief of the Federal Republic of Germany et al. as Amici Curiae in Support of Defendants-Appellees at 7, *Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267 (D.C. Cir. 2005) (No. 01-7115).

Because the panel mistakenly believed that "the effect in the United States of the price fixing [in this case] could not give rise to an antitrust claim" by anyone for any reason, Op. 6, it never addressed whether Motorola's injuries were sufficiently intertwined with the effect on U.S. commerce to satisfy the "gives rise to" requirement. If Motorola is able to establish the necessary link between its injuries and the price-fixing conspiracy's effect on U.S. commerce in cellphones, a decision by this Court allowing Motorola to pursue its Category II claims in the United States would maintain the balance Congress struck in Section 6a to preserve effective antitrust enforcement

while avoiding unreasonable interference with the regulation of foreign markets by other countries.

   Respectfully submitted.

                                        /s/ Nickolai G. Levin

MARY C. MCLEOD                          WILLIAM J. BAER
   *Principal Deputy Legal Adviser*        *Assistant Attorney General*
   **U.S. Department of State**          BRENT SNYDER
   **Washington, D.C. 20520**              *Deputy Assistant Attorney General*
                                        KRISTEN C. LIMARZI
KELLY R. WELSH                          JAMES J. FREDRICKS
   *General Counsel*                     NICKOLAI G. LEVIN
   **U.S. Department of Commerce**          *Attorneys*
   **Washington, D.C. 20230**              **U.S. Department of Justice**
                                           **Washington, D.C. 20530-0001**
DAVID C. SHONKA                            **(202) 514-2886**
   *Acting General Counsel*
JOHN F. DALY
   *Deputy General Counsel for Litigation*
MARK S. HEGEDUS
   *Attorney*
   **Office of the General Counsel**
   **Federal Trade Commission**
   **Washington, D.C. 20580**

 **June 27, 2014**

**16**

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007 with 12-point Georgia font in text and the footnotes.

June 27, 2014                                        /s/ Nickolai G. Levin
                                                     Nickolai G. Levin

## CERTIFICATE OF SERVICE

I, Nickolai G. Levin, hereby certify that on June 27, 2014, I electronically filed the foregoing Supplemental Brief for the United States as Amicus Curiae with the Clerk of the Court of the United States Court of Appeals for the Seventh Circuit by using the CM/ECF System. Once the brief is accepted for filing by the Clerk's Office, I will send 30 copies to the Clerk of the Court by FedEx.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

June 27, 2014                                    /s/ Nickolai G. Levin
                                                 Nickolai G. Levin

18